U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED   MAR 2 8 2007

LORETTA G. WHYTE
       CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| THE SHOE SHOW OF ROCKY MOUNT, INC. | * | CIVIL ACTION |
| V. | * | NO. 07-1315 |
| PALACE PROPERTIES, L.L.C., SIZELER HAMMOND SQUARE LIMITED PARTNERSHIP, AND SIZELER PROPERTY INVESTORS, INC. | * | SECTION "L"(5) |

ORDER & REASONS

Before the Court is Plaintiff Shoe Show of Rocky Mount, Inc.'s ("Shoe Show") Motion for a Preliminary Injunction. For the following reasons, the motion is DENIED.

**I. Factual and Procedural Background**

This case concerns whether the lease of a tenant operating a retail shoe store in a shopping complex was wrongfully terminated. The tenant, Shoe Show, signed a lease for retail space in Hammond Square Shopping Center ("Leased Premises"), located in Hammond, Louisiana, on June 24, 1994. The lease provided that the term would last for a five year and three month period ending on January 31, 2000, but was subject to two consecutive renewal options of five years each. The optional renewals were subject to the same terms as the original lease, and Shoe Show timely exercised those options on July 21, 1999 and July 27, 2004, which rendered the lease effective until January 21, 2010.

Through a series of transactions, the original landlord Sizeler Property Investors, Inc. ("SPI") transferred the Leased Premises to Sizeler Hammond Square Limited Partnership ("Sizeler"), and thereafter Sizeler transferred the Leased Premises to Palace Properties, L.L.C. ("Palace") by cash deed on May 11, 2006. On September 30, 2006, Palace sent Shoe Show a

___ Fee_____
___ Process____
_X_ Dktd_____
___ CtRmDep___
___ Doc. No.___

letter stating that the lease would be terminated in its entirety, effective March 31, 2007, because Palace was demolishing the existing shopping center to make way for redevelopment. On November 2, 2006, Shoe Show sent a letter to Sizeler and Palace stating that it considered termination premature, constituting a wrongful eviction and breach of contract, and Shoe Show demanded the acknowledgment of its rights under the lease. No resolution has thus far been achieved, and Shoe Show claims that Palace has already begun to demolish the shopping center in which the Leased Premises are located.

On March 16, 2007, Shoe Show filed a complaint in this Court against Palace, SPI and Sizeler (together, the "Defendants") based on diversity jurisdiction.[1] Shoe Show brings claims for breach of contract and warranty of peaceful possession and seeks remedies of specific performance and preliminary injunctive relief to prohibit the Defendants from evicting Shoe Show and/or demolishing the shopping center in which the Leased Premises are located to preserve the status quo until trial on the merits.

The Court will deal with the Plaintiff's request for the preliminary injunction at this time. At a status conference held on March 22, 2007, the parties agreed that no factual dispute existed for purposes of deciding the preliminary injunction issue, so that a hearing was unnecessary. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) ("If no factual dispute is involved...no oral hearing is necessary."). Accordingly, the parties agreed to submit the issue to the Court through briefs and a Joint Stipulation of Facts. The Court is in receipt of the parties'

---

[1] In its complaint, Shoe Show states that it is a North Carolina corporation, Palace is a Louisiana limited liability company whose members are Louisiana domiciliaries, Sizeler is a Delaware limited partnership whose general partner is a Louisiana corporation, SPI is a Delaware corporation, and the amount in controversy exceeds $75,000.00 (Pl. Compl. ¶¶ 1 &2).

2

briefs and the Joint Stipulation and is now ready to rule after reviewing these documents.

## II. Motion for Preliminary Injunction

According to Fifth Circuit jurisprudence, a district court must apply a four-prong test to determine whether a preliminary injunction is appropriate. The court may, in its discretion, grant a preliminary injunction if the moving party establishes four factors:

> (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest.

*Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989) (internal citations omitted); *see also Canal Authority of State of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974). "A preliminary injunction is an extraordinary remedy and should be granted only if the movant has clearly carried the burden of persuasion with respect to *all four* factors." *Allied Marketing*, 878 F.2d at 809 (emphasis added). Thus, "the decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (quoted in *Karaha Bodas Co. v. Negara*, 335 F.3d 357, 363-64 (5th Cir. 2003)). If the plaintiff fails to establish his or her burden of persuasion regarding any of the four prongs, the request for a preliminary injunction must be denied. *See PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 546 (5th Cir. 2005) (stating plaintiff carries burden of persuasion).

The district court must set forth its findings of fact and conclusions of law regarding its decision to grant or refuse the preliminary injunction and explain its reasons for its decision with sufficient particularity. *See* Fed. R. Civ. P. 52; *Allied Marketing*, 878 F.2d at 810.

Accordingly, the Court addresses the merits of both parties' arguments in accordance with Rule 52(a).

### a. Likelihood of Success on the Merits

When making a determination of whether it is likely the moving party will be successful on the merits, the district court evaluates the standards of applicable substantive law. However, it is important to the note at the outset that the court's conclusion does not represent a final determination on the merits. *Mississippi Power*, 760 F.2d at 623.

This Court has jurisdiction over the matter based on diversity, and thus Louisiana law applies. *See FMC Finance Corp. v. Reed*, 592 F.2d 238, 241 (5th Cir. 1979). Under Louisiana law, a contract must be strictly construed. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties intent." La. Civ. Code art. 2046. Each provision of the contract must be interpreted considering all other provisions so that each provision is given the meaning suggested by the contract as a whole. La. Civ. Code. art. 2050.

The lease agreement contains clear and specific rights and obligations of each party, including a provision which entitles Shoe Show to quiet enjoyment of the property. (Lease Agt. ¶ 5(d)). Moreover, the lease specifically states that the landlord must require any purchaser of the property or assignee to the lease to assume the lessor/landlord's responsibilities under the lease by recorded agreement. (Lease Agt. ¶ 6(h)). Thus, a reading of the Lease Agreement and Palace's letter stating that it would terminate Shoe Show's lease in order to demolish and redevelop the shopping complex (Ex. A to Joint Stipulation) reveals that Shoe Show is entitled to claim damages from Palace for breach of contract and warranty of peaceful possession.

4

Regarding Shoe Show's claims against Sizeler and SPI, the lease negates any claims by Shoe Show for breach of contract, wrongful eviction and injunctive relief as the lease specifically provides:

> The estate in the Shopping Center presently is held in the entity named herein as Landlord [Sizeler]; however, it is recognized that during the term of this lease, Landlord may assign and convey Landlord's interest in the property affected by this lease to a corporation, individual or other entity will be or become Landlord hereunder. If Landlord shall assign and convey its leasehold interest herein to a corporation, individual or other entity during the existence of this lease, and such assignee agrees in writing to assume the obligations of Landlord under this lease, then upon and after such assignment and conveyance, *all references to it as the Landlord shall be deemed to refer only to such assignee and its successors and assigns, and neither Landlord nor its representatives shall have further rights or obligations hereunder, except those relating to the period of time preceding the date of assignment.*

(Lease Agt. ¶ 7(a)) (emphasis added). As the lease was assigned and transferred to another party by cash deed before the eviction letter was sent to Shoe Show, Sizeler and SPI are not liable for Shoe Show's damages. The cash deed between SPI and Palace represents written evidence of Palace's assumption of obligations as landlord of the Leased Premises.

### b. Irreparable Injury

"An irreparable injury is one that cannot be remedied by an award of economic damages." *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *Hibernia Nat'l Bank v. Blossman*, 583 So.2d 5 (La. App. 4 Cir. 1991). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975) (internal citations and quotations omitted). However, a finding of irreparable harm may be appropriate when economic

rights are involved if the determination of the dollar value of the loss is particularly difficult or speculative. *Allied Marketing*, 878 F.2d at 810.

Shoe Show states that irreparable injury would occur if an injunction was not granted because the location of the Leased Premises is special and unique, is in imminent danger of demolition, and cannot be duplicated by remedy at law. However, the Court finds that a party who is injured by wrongful termination of a lease may be adequately compensated by monetary damages which can be calculated after a successful trial on the merits. There exists a substantial sales history representing over twelve years of Shoe Show's business operations at the Leased Premises from which the Court and the parties may calculate the harm incurred by Shoe Show. Additionally, the cost of displacement or move to another location, should Shoe Show desire to continue operations in the community, is easily quantifiable. Though the location of the shopping complex could be valuable, there are many other available locations in the local area where Shoe Show could relocate its operations. The Defendant avers that it has even offered Shoe Show space at an alternative site to lessen the disruption to Shoe Show's business caused by the redevelopment.

c.  **Balance of Harm**

The third prong concerns weighing the injury caused to the moving party if the injunction is not granted against the injury caused to the non-movant if the injunction is granted. Shoe Show states that the Leased Premises are unique and an injunction will serve to preserve the status quo and mitigate Shoe Show's damages by permitting it to continue operations at the Leased Premises pending trial on the merits.

However, though Shoe Show argues that it will be subject to substantial harm should it be

forced to leave the Leased Premises, significant economic injury to Shoe Show would occur should an injunction be granted. Shoe Show states that demolition has already begun, and Palace states that only three tenants with outside access to parking areas will remain in their current location during and after the demolition process. The parties stipulate that all "Interior Tenants" of the multi-level shopping complex have agreed to vacate their respective leased premises by March 31, 2007. Thus, Shoe Show is the only holdout. If an injunction is granted, the voluntary abandonment of all other retail stores within the complex would have a significant and immediate negative impact on Shoe Show's sales. The attractiveness and convenience of the shopping complex would decline considerably, and Shoe Show's profits would decrease in response.

The harm of an injunction to Palace is also substantial as it will suffer significant economic losses from any delay in the demolition and redevelopment project. Palace contends that timing is critical to the demolition process because this particular stage in the project requires coordination with other parties and the City of Hammond. Palace and Shoe Show stipulate that the City of Hammond is investing more than $13 million in infrastructure improvements contingent upon Palace's timely demolition of the existing complex and redevelopment. Moreover, the sales tax revenue from which Hammond will benefit due to more than a 100% expansion of retail space square footage is significant, $241,850,000.00. The parties also stipulate that the redevelopment project will generate real estate taxes in excess of $651,000.00 and create 900 construction jobs and 1,231 permanent jobs. Palace will spend approximately $56 million in total on the redevelopment project, and Target, J.C. Penney and Home Depot are anticipated to begin construction shortly of their respective premises at an

estimated cost of $31 million. The cost estimates for Palace, Target, J.C. Penney and Home Depot are all contingent on the condition that the improvements are required to be in "operating condition" by 2008. Otherwise, these parties will not be able to take advantage of accelerated depreciation and low interest financing.

In this case, the Court finds that the harm to Defendant Palace, various third party retailers, the City of Hammond and even injury to Shoe Show by granting an injunction greatly outweighs any benefit in granting one.

### d. Public Interest

The Court has already described the significant detrimental impact to the City of Hammond and its residents if an injunction is granted– the City would miss out on substantial tax revenue, a significant expansion of retail options and employment opportunities to residents would be prevented, and an estimated $13 million planned investment by the City would be jeopardized. Though the public has an interest in knowing that contracts will be enforced and that people who breach agreements may not profit or otherwise benefit from such conduct, *see Corp. Relocation, Inc v. Martin*, 2006 U.S. Dist. LEXIS 69098, at *59 (N.D. Tex. Sept. 12, 2006), the economic harm to the community is a significant concern that weighs in favor of denial of an injunction.

### III. Conclusion

Accordingly, Shoe Show's motion for a preliminary injunction is DENIED.

New Orleans, Louisiana, this __27th__ day of ___March___, 2007.

_____
UNITED STATES DISTRICT JUDGE